FILED

2008 JUL 21 AM 9:45

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No: 8.08CV1395-T30TGW

MATT GEIGER,

   Plaintiff,

v.

GLOBAL ASSET HOLDINGS LLC,

   Defendant.
_____/

## COMPLAINT

Plaintiff, MATT GEIGER, by and through his undersigned attorneys, sue Defendant GLOBAL ASSET HOLDINGS LLC, and alleges:

1. This is an action for specific performance of a Contract For Sale and Purchase of real and personal property located in Pinellas County, Florida.

2. Plaintiff Matt Geiger is a citizen of the State of Florida who resides in Pinellas County, Florida.

3. Defendant Global Asset Holdings LLC is a Delaware limited liability company.

4. Defendant Global Asset Holdings LLC has not been incorporated by the State of Florida and does not have its principal place of business

in Florida. Defendant is not a citizen of Florida for purposes of federal diversity jurisdiction.

5. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1332 in that it is a civil action between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6. This court has jurisdiction over the defendant pursuant to 48.193(1)(g) Florida Statutes in that this action arises from the defendant's breach of a contract in this state by failing to perform acts required by the contract to be performed in this state, specifically the purchase of Florida real and personal property.

7. Venue is proper in this Court under 28 U.S.C. 1391 in that this action is founded only on diversity of citizenship and the property that is the subject of this action is situated in this judicial district.

8. On or about November 27, 2007, Plaintiff and Defendant entered into a Contract For Sale and Purchase of certain real and personal property located in Pinellas County, Florida. Plaintiff was the seller and Defendant the buyer under that contract. A true and correct copy of the Contract For Sale and Purchase is attached hereto as Exhibit "A."

9. Under the terms of the Contract For Sale and Purchase, Defendant was to pay Plaintiff $21 million for the property in a cash transaction within 90 days of November 27, 2007.

10. In December of 2007, Plaintiff was offered the sum of $15 million for the property by another buyer who wanted to close the transaction in an expedited manner. Plaintiff requested Defendant to release him from the Contract For Sale and Purchase in order to pursue the expedited sale to the other buyer. That request was refused, and Defendant's agent continued to assure Plaintiff that Defendant would close the sale as contracted.

11. Thereafter, on or about February 25, 2008, Defendant's agent informed Plaintiff that Defendant did not intend to purchase the property due to, "market conditions in the real estate market across the country."

12. Plaintiff was at all times material to this action and is currently in possession of good and marketable title to the subject property and ready, willing and able to convey such title to Defendant.

13. Despite Plaintiff's capacity and willingness to convey good and marketable title to the subject property to Defendant and despite Defendant's contractual obligation to purchase that property, Defendant refused to do so.

14. The Contract For Sale and Purchase provides that if Defendant fails to perform the contract within the time specified, Plaintiff, at his option, may proceed in equity to enforce his contract rights.

15. The Contract For Sale and Purchase further provides for recovery of prevailing party attorneys fees, costs and expenses in any litigation arising out of that contract.

16. Plaintiff has retained the undersigned law firm to represent him in this action and is obligated to pay a reasonable fee for its services.

17. In accordance with the well established Florida law of <u>Clements v. Leonard</u>, 70 So.2d 840 (Fla. 1954), Plaintiff seeks specific performance of the contract, failing which the court will enter judgment against and order the property to be sold at public sale with the sale proceeds applied to the judgment amount.

Wherefore Plaintiff Matt Geiger demands the following relief against Defendant Global Asset Holdings LLC in the form of Order(s) or Judgment(s):

1. Compelling specific performance of the Contract For Sale and Purchase, specifically purchase by the Defendant at the contract amount, within the time set by the Court;

2. Providing that if Defendant fails to specifically perform the contract as ordered, that judgment for the contract purchase price together with

    Plaintiff's attorneys fees, costs and expenses be entered in favor of Plaintiff against Defendant;

3. Conveying the property to Defendant, expressly subject to the judgment in favor of Plaintiff and subject to a pending public sale; and

4. Providing that if the judgment amount is not paid by Defendant within the time set by the Court, that the property be sold at public sale, in the nature of a foreclosure sale, with Plaintiff having the right to bid up to the amount of judgment and with the sale proceeds applied against the judgment amount;

5. That the Court retain jurisdiction to enter such other Orders and may be appropriate to transfer title and possession of the property to the purchaser at the public sale;

6. In the event the public sale fails to satisfy judgment, that a final and executable deficiency judgment be entered against Defendant for the difference; and

7. Such other and further relief as the court deems meet and proper.

Dated this ___ day of July, 2008.

Respectfully submitted,

_____
**WILLIAM H. HUGHES III**
whugh@penningtonlaw.com
Florida Bar No. 0628263
**PENNINGTON, MOORE, WILKINSON,
BELL & DUNBAR, P.A.**
Post Office Box 10095
Tallahassee, Florida 32302,
(850) 222-3533 - Telephone
(850) 222-2126 - Facsimile
**Attorneys for Plaintiff
Matt Geiger**

NOV-19-2007 20:02 From:TRIFORBES        3523943209        To:18662128090        Page:2/6

THIS FORM HAS BEEN APPROVED BY THE FLORIDA ASSOCIATION OF REALTORS* AND THE FLORIDA BAR

**Contract For Sale And Purchase**

1*  PARTIES: Matthew A Geiger                                                              ("Seller")
2*  and Global Asset Holding, LLC                                                          ("Buyer")
3   hereby agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property (collectively "Property")
4   pursuant to the terms and conditions of this Contract for Sale and Purchase and any riders and addenda ("Contract"):
5   I. DESCRIPTION:
6*      (a) Legal description of the Real Property located in Pinellas _____ County, Florida: _____
7*      Pt SE 1/4 of SEC 10 & PT SW 1/4 of SEC 11 COM E 1/4 COR SEC 10;
8*      (b) Street address, city, zip, of the Property: 3385 Old Keystone Road, Tarpon Springs
9       (c) Personal Property includes existing range(s), refrigerator(s), dishwasher(s), ceiling fan(s), light fixture(s), and window treatment(s) unless
10      specifically excluded below.
11*     Other items included are: on attached sheet, this home comes completely furnished
12*     
13*     Items of Personal Property (and leased items, if any) excluded are: _____
14*
15* II. PURCHASE PRICE (U.S. currency): ................................................. $ 21,000,000.00
16  PAYMENT:
17*     (a) Deposit held in escrow by North American Title ("Escrow Agent") in the amount of (checks subject to clearance) $ 1.00
18*     Escrow Agent's address: _____ Phone: _____
19*     (b) Additional escrow deposit to be made to Escrow Agent within ___ days after Effective Date in the amount of .......... $ _____
20*     (c) Financing in the amount of ("Loan Amount") see Paragraph IV below ............................. $ _____
21*     (d) Other ................................................. $ _____
22*     (e) Balance to close by cash, wire transfer or LOCALLY DRAWN cashier's or official bank check(s), subject
23*     to adjustments or prorations ................................................. $ 20,999,999.00
24* III. TIME FOR ACCEPTANCE OF OFFER AND COUNTEROFFERS; EFFECTIVE DATE:
25      (a) If this offer is not executed by and delivered to all parties OR FACT OF EXECUTION communicated in writing between the parties on or
26*     before 11/24/2007 11/29/07, the deposit(s) will, at Buyer's option, be returned and this offer withdrawn. Unless other-
27      wise stated, the time for acceptance of any counteroffers shall be 2 days from the date the counteroffer is delivered.
28      (b) The date of Contract ("Effective Date") will be the date when the last one of the Buyer and Seller has signed or initialed this offer or the
29      final counteroffer. If such date is not otherwise set forth in this Contract, then the "Effective Date" shall be the date determined above for
30      acceptance of this offer or, if applicable, the final counteroffer.
31  IV. FINANCING:
32*     ☒ (a) This is a cash transaction with no contingencies for financing;
33*     ☐ (b) This Contract is contingent on Buyer obtaining written loan commitment which confirms underwriting loan approval for a loan to purchase
34      the Property ("Loan Approval") within ___ days (if blank, then 30 days) after Effective Date ("Loan Approval Date") for (CHECK ONLY
35*     ONE): ☐ a fixed; ☐ an adjustable; or ☐ a fixed or adjustable rate loan. In the Loan Amount (See Paragraph II.(c)) at an initial interest rate not to
36*     exceed ___%, and for a term of ___ years. Buyer will make application within ___ days (if blank, then 5 days) after Effective Date.
37      BUYER: Buyer shall use reasonable diligence to: obtain Loan Approval; notify Seller in writing of receipt of Loan Approval by Loan Approval
38      Date; satisfy terms of the Loan Approval; and close the loan. Loan Approval which requires a condition related to the sale of other property shall
39      not be deemed Loan Approval for purposes of this subparagraph. Buyer shall pay all loan expenses. Buyer authorizes the mortgage broker(s) and
40      lender(s) to disclose information regarding the conditions, status, and progress of loan application and Loan Approval to Seller, Seller's attorney,
41      real estate licensee(s), and Closing Agent.
42      SELLER: If Buyer does not deliver to Seller written notice of Loan Approval by Loan Approval Date, Seller may thereafter cancel this Contract by
43      delivering written notice ("Seller's Cancellation Notice") to Buyer, but not later than seven (7) days prior to Closing. Seller's Cancellation Notice shall
44      notify Buyer that Buyer has three (3) days to deliver to Seller written notice waiving this Financing contingency, or the Contract shall be cancelled.
45      DEPOSIT(S) (for purposes of this Financing Paragraph IV(b) only): If Buyer has used reasonable diligence but does not obtain Loan Approval
46      by Loan Approval Date, and thereafter either party elects to cancel this Contract, the deposit(s) shall be returned to Buyer. If Buyer obtains Loan
47      Approval or waives this Financing contingency, and thereafter the Contract does not close, then the deposit(s) shall be paid to Seller, provided how-
48      ever, if the failure to close is due to: (i) Seller's failure or refusal to close or Seller otherwise fails to meet the terms of the Contract, or (ii) Buyer's lender
49      fails to receive and approve an appraisal of the Property in an amount sufficient to meet the terms of the Loan Approval, then the deposit(s) shall be
50      returned to Buyer.
51*     ☐ (c) Assumption of existing mortgage (see rider for terms); or
52*     ☐ (d) Purchase money note and mortgage to Seller (see Standards B and K and riders; addenda; or special clauses for terms).
53* V. TITLE EVIDENCE: At least 5 days (if blank, then 5 days) before Closing a title insurance commitment with legible copies of instruments listed as
54  exceptions attached thereto ("Title Commitment") and, after Closing, an owner's policy of title insurance (see Standard A for terms) shall be obtained by:
55*     (CHECK ONLY ONE): ☒ (1) Seller, at Seller's expense and delivered to Buyer or Buyer's attorney; or
56*     ☐ (2) Buyer at Buyer's expense.
57*     (CHECK HERE): ☐ If an abstract of title is to be furnished instead of title insurance, and attach rider for terms.
58* VI. CLOSING DATE: This transaction shall be closed and the closing documents delivered on 2/19/2008 ("Closing"), unless
59  modified by other provisions of this Contract. In the event of extreme weather or other conditions or events constituting "force majeure", Closing will be
60  extended a reasonable time until: (i) restoration of utilities and other services essential to Closing; and (ii) availability of Hazard, Wind, Flood, or Homeowners'
61* insurance. If such conditions continue more than ___ days (if blank, then 14 days) beyond Closing Date, then either party may cancel this Contract.

FAR/BAR-8   Rev. 9/07   ©2007   Florida Association of Realtors® and The Florida Bar   All Rights Reserved   Page 1 of 4



EXHIBIT A

62  VII. **RESTRICTIONS; EASEMENTS; LIMITATIONS:** Seller shall convey marketable title subject to: comprehensive land use plans, zoning, restrictions,
63  prohibitions and other requirements imposed by governmental authority; restrictions and matters appearing on the plat or otherwise common to the subdivi-
64  sion; outstanding oil, gas and mineral rights of record without right of entry; unplatted public utility easements of record (located contiguous to real property
65  lines and not more than 10 feet in width as to the rear or front lines and 7 1/2 feet in width as to the side lines); taxes for year of Closing and subsequent years;
66  and assumed mortgages and purchase money mortgages, if any (if additional items, see addendum); provided, that there exists at Closing no violation of the
67  foregoing and none prevent use of the Property for ___residential___ purpose(s).
68  VIII. **OCCUPANCY:** Seller shall deliver occupancy of Property to Buyer at time of Closing unless otherwise stated herein. If Property is intended
69  to be rented or occupied beyond Closing, the fact and terms thereof and the tenant(s) or occupants shall be disclosed pursuant to Standard F.
70  If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to Property from date of occupancy, shall be responsible and liable
71  for maintenance from that date, and shall be deemed to have accepted Property in its existing condition as of time of taking occupancy.
72  IX. **TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Typewritten or handwritten provisions, riders and addenda shall control all printed pro-
73  visions of this Contract in conflict with them.
74* X. **ASSIGNABILITY: (CHECK ONLY ONE):** Buyer ☒ may assign and thereby be released from any further liability under this Contract; ☐ may
75* assign but not be released from liability under this Contract; or ☐ may not assign this Contract.
76  XI. **DISCLOSURES:**
77      (a) The Property may be subject to unpaid special assessment lien(s) imposed by a public body ("public body" does not include a
78      Condominium or Homeowners' Association). Such lien(s), if any, whether certified, confirmed and ratified, pending, or payable in installments,
79*     as of Closing, shall be paid as follows: ☐ by Seller at closing ☐ by Buyer (if left blank, then Seller at Closing). If the amount of any
80      assessment to be paid by Seller has not been finally determined as of Closing, Seller shall be charged at Closing an amount equal to the
81      last estimate or assessment for the improvement by the public body.
82      (b) Radon is a naturally occurring radioactive gas that when accumulated in a building in sufficient quantities may present health risks to per-
83      sons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.
84      Additional information regarding radon or radon testing may be obtained from your County Public Health unit.
85      (c) Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or desires additional information
86      regarding mold, Buyer should contact an appropriate professional.
87      (d) Buyer acknowledges receipt of the Florida Energy-Efficiency Rating Information Brochure required by Section 553.996, F.S.
88      (e) If the Real Property includes pre-1978 residential housing then a lead-based paint rider is mandatory.
89      (f) If Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act, the parties shall comply with that Act.
90      (g) **BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS' ASSOCIA-**
91      **TION/COMMUNITY DISCLOSURE.**
92      (h) PROPERTY TAX DISCLOSURE SUMMARY: BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT
93      OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNER-
94      SHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES.
95      IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.
96  XII. **MAXIMUM REPAIR COSTS:** Seller shall not be responsible for payments in excess of:
97*     (a) $___0.00___ for treatment and repair under Standard D (if blank, then 1.5% of the Purchase Price).
98*     (b) $___0.00___ for repair and replacement under Standard N not caused by Wood Destroying Organisms (if blank, then 1.5% of the Purchase Price).
99* XIII. **HOME WARRANTY:** ☐ Seller ☐ Buyer ☒ N/A will pay for a home warranty plan issued by _____
100* at a cost not to exceed $_____
101 XIV. **RIDERS; ADDENDA; SPECIAL CLAUSES:** CHECK those riders which are applicable AND are attached to and made part of this Contract:
102*    ☐ CONDOMINIUM ☐ VA/FHA ☐ HOMEOWNERS' ASSN. ☐ LEAD-BASED PAINT ☐ COASTAL CONSTRUCTION CONTROL LINE
103*    ☐ INSULATION ☐ "AS IS" ☐ EVIDENCE OF TITLE (SOUTH FLORIDA CONTRACTS) ☐ Other Comprehensive Rider Provisions ☒ Addenda
104*    Special Clause(s):
105*    see attached furniture list
106* _____
107* _____
108 XV. **STANDARDS FOR REAL ESTATE TRANSACTIONS ("Standards"):** Buyer and Seller acknowledge receipt of a copy of Standards A
109 through Y on the reverse side or attached, which are incorporated as part of this Contract.
110 **THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE ADVICE OF AN ATTORNEY PRIOR TO SIGNING.**
111 THIS FORM HAS BEEN APPROVED BY THE FLORIDA ASSOCIATION OF REALTORS® AND THE FLORIDA BAR.
112 Approval does not constitute an opinion that any of the terms and conditions in this Contract should be accepted by the parties in a particular transac-
113 tion. Terms and conditions should be negotiated based upon the respective interests, objectives and bargaining positions of all interested persons.
114 AN ASTERISK(*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK TO BE COMPLETED.

115* _____/s/ manger_____  11-24-07      _____/s/_____      11-27-07
116  (BUYER)              (DATE)          (SELLER)           (DATE)
117  Global Asset Holdings, LLC
118  (BUYER)              (DATE)          (SELLER)           (DATE)
119  Buyer' address for purposes of notice _____   Seller' address for purposes of notice 3385 old Keystone Rd.
120  _____                                         Tarpon Springs FL 34688
121  _____ Phone                                   727 943 8919 Phone
122 **BROKERS:** The brokers (including cooperating brokers, if any) named below are the only brokers entitled to compensation in connection with
123 this Contract:
124* Name:   Avalar Real Estate Services/Trisha Browne 4%        Toni Everett Company 2%
125         Cooperating Brokers, if any                          Listing Broker

FAR/BAR-8  Rev. 9/07  © 2007  Florida Association of Realtors® and The Florida Bar  All Rights Reserved  Page 2 of 4

MG

## STANDARDS FOR REAL ESTATE TRANSACTIONS

126
127  A. TITLE INSURANCE: The Title Commitment shall be issued by a Florida licensed title insurer agreeing to issue Buyer, upon recording of the deed to Buyer, an
128  owner's policy of title insurance in the amount of the purchase price, insuring Buyer's marketable title to the Real Property, subject only to matters contained in
129  Paragraph VII and those to be discharged by Seller at or before Closing. Marketable title shall be determined according to applicable Title Standards adopted by
130  authority of The Florida Bar and in accordance with law. Buyer shall have 5 days from date of receiving the Title Commitment to examine it, and if title is found defec-
131  tive, notify Seller in writing specifying defect(s) which render title unmarketable. Seller shall have 30 days from receipt of notice to remove the defects, failing which
132  Buyer shall, within 5 days after expiration of the 30 day period, deliver written notice to Seller either: (1) extending the time for a reasonable period not to exceed 120
133  days within which Seller shall use diligent effort to remove the defects; or (2) requesting a refund of deposit(s) paid which shall be returned to Buyer. If Buyer fails to
134  so notify Seller, Buyer shall be deemed to have accepted the title as it then is. Seller shall, if title is found unmarketable, use diligent effort to correct defect(s) within
135  the time provided. If, after diligent effort, Seller is unable to timely correct the defects, Buyer shall either waive the defects, or receive a refund of deposit(s), thereby
136  releasing Buyer and Seller from all further obligations under this Contract. If Seller is to provide the Title Commitment and it is delivered to Buyer less than 5 days prior
137  to Closing, Buyer may extend Closing so that Buyer shall have up to 5 days from date of receipt to examine same in accordance with this Standard.
138  B. PURCHASE MONEY MORTGAGE; SECURITY AGREEMENT TO SELLER: A purchase money mortgage and mortgage note to Seller shall provide for a
139  30 day grace period in the event of default if a first mortgage and a 15 day grace period if a second or lesser mortgage; shall provide for right of prepayment
140  in whole or in part without penalty; shall permit acceleration in event of transfer of the Real Property; shall require all prior liens and encumbrances to be kept
141  in good standing; shall forbid modifications of, or future advances under, prior mortgage(s); shall require Buyer to maintain policies of insurance containing a
142  standard mortgagee clause covering all improvements located on the Real Property against fire and all perils included within the term extended coverage
143  endorsements and such other risks and perils as Seller may reasonably require, in an amount equal to their highest insurable value; and the mortgage, note
144  and security agreement shall be otherwise in form and content required by Seller; but Seller may only require clauses and coverage customarily found in mort-
145  gages, mortgage notes and security agreements generally utilized by savings and loan institutions or state or national banks located in the county wherein the
146  Real Property is located. All Personal Property and leases being conveyed or assigned will, at Seller's option, be subject to the lien of a security agreement evi-
147  denced by recorded or filed financing statements or certificates of title. If a balloon mortgage, the final payment will exceed the periodic payments thereon.
148  C. SURVEY: Buyer, at Buyer's expense, within time allowed to deliver evidence of title and to examine same, may have the Real Property surveyed and certified
149  by a registered Florida surveyor. If the survey discloses encroachments on the Real Property or that improvements located thereon encroach on setback lines, ease-
150  ments, lands of others or violate any restrictions, Contract covenants or applicable governmental regulations, the same shall constitute a title defect.
151  D. WOOD DESTROYING ORGANISMS: "Wood Destroying Organisms" (WDO) shall be deemed to include all wood destroying organisms required to be report-
152  ed under the Florida Structural Pest Control Act, as amended. Buyer, at Buyer's expense, may have the Property inspected by a Florida Certified Pest Control Operator
153  ("Operator") within 20 days after the Effective Date to determine if there is any visible active WDO infestation or visible damage from WDO infestation, excluding fences.
154  If either or both are found, Buyer may within said 20 days (1) have cost of treatment of active infestation estimated by the Operator; (2) have all damage inspected
155  and cost of repair estimated by an appropriately licensed contractor; and (3) report such cost(s) to Seller in writing. Seller shall cause the treatment and repair of all
156  WDO damage to be made and pay the costs thereof up to the amount provided in Paragraph XII(a). If estimated costs exceed that amount, Buyer shall have the
157  option of cancelling this Contract by giving written notice to Seller within 20 days after the Effective Date, or Buyer may elect to proceed with the transaction and
158  receive a credit at Closing equal to the amount provided in Paragraph XII(a). If Buyer's lender requires an updated WDO report, then Buyer shall, at Buyer's expense,
159  have the opportunity to have the Property re-inspected for WDO infestation and have the cost of active infestation or new damage estimated and reported to Seller
160  in writing at least 10 days prior to Closing, and thereafter, Seller shall cause such treatment and repair to be made and pay the cost thereof; provided, Seller's total
161  obligation for treatment and repair costs required under both the first and second inspection shall not exceed the amount provided in Paragraph XII (a).
162  E. INGRESS AND EGRESS: Seller warrants and represents that there is ingress and egress to the Real Property sufficient for its intended use as described
163  in Paragraph VII hereof and title to the Real Property is insurable in accordance with Standard A without exception for lack of legal right of access.
164  F. LEASES: Seller shall, at least 10 days before Closing, furnish to Buyer copies of all written leases and estoppel letters from each tenant specifying the nature
165  and duration of the tenant's occupancy, rental rates, advanced rent and security deposits paid by tenant. If Seller is unable to obtain such letter from each ten-
166  ant, the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit, and Buyer may thereafter contact ten-
167  ant to confirm such information. If the terms of the leases differ materially from Seller's representations, Buyer may terminate this Contract by delivering written
168  notice to Seller at least 5 days prior to Closing. Seller shall, at Closing, deliver and assign all original leases to Buyer.
169  G. LIENS: Seller shall furnish to Buyer at time of Closing an affidavit attesting to the absence, unless otherwise provided for herein, of any financing statements,
170  claims of lien or potential lienors known to Seller and further attesting that there have been no improvements or repairs to the Real Property for 90 days imme-
171  diately preceding date of Closing. If the Real Property has been improved within that time, Seller shall deliver releases or waivers of construction
172  liens executed by all general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth the names of all such gen-
173  eral contractors, subcontractors, suppliers and materialmen, further affirming that all charges for improvements or repairs which could serve as a basis for a
174  construction lien or a claim for damages have been paid or will be paid at the Closing of this Contract.
175  H. PLACE OF CLOSING: Closing shall be held in the county wherein the Real Property is located at the office of the attorney or other closing agent ("Closing
176  Agent") designated by the party paying for title insurance, or, if no title insurance, designated by Seller.
177  I. TIME: Calendar days shall be used in computing time periods except periods of less than six (6) days, in which event Saturdays, Sundays and state or nation-
178  al legal holidays shall be excluded. Any time periods provided for herein which shall end on a Saturday, Sunday, or a legal holiday shall extend to 5:00 p.m. of the
179  next business day. Time is of the essence in this Contract.
180  J. CLOSING DOCUMENTS: Seller shall furnish the deed, bill of sale, certificate of title, construction lien affidavit, owner's possession affidavit, assignments of leases,
181  tenant and mortgagee estoppel letters and corrective instruments. Buyer shall furnish mortgage, mortgage note, security agreement and financing statements.
182  K. EXPENSES: Documentary stamps on the deed and recording of corrective instruments shall be paid by Seller. All costs of Buyer's loan (whether obtained
183  from Seller or third party), including, but not limited to, documentary stamps and intangible tax on the purchase money mortgage and any mortgage assumed,
184  mortgagee title insurance commitment with related fees, and recording of purchase money mortgage to Seller, deed and financing statements, shall be paid by
185  Buyer. Unless otherwise provided by law or rider to this Contract, charges for related closing services, title search, and closing fees (including preparation of
186  closing statement), shall be paid by the party responsible for furnishing the title evidence in accordance with Paragraph V.
187  L. PRORATIONS; CREDITS: Taxes, assessments, rent, interest, insurance and other expenses of the Property shall be prorated through the day before Closing.
188  Buyer shall have the option of taking over existing policies of insurance, if assumable, in which event premiums shall be prorated. Cash at Closing shall be increased
189  or decreased as may be required by prorations to be made through day prior to Closing, or occupancy, if occupancy occurs before Closing. Advance rent and
190  security deposits will be credited to Buyer. Escrow deposits held by mortgagee will be credited to Seller. Taxes shall be prorated based on the current year's tax
191  with due allowance made for maximum allowable discount, homestead and other exemptions. If Closing occurs at a date when the current year's millage is not
192  fixed and current year's assessment is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's assessment is not
193  available, then taxes will be prorated on prior year's tax. If there are completed improvements on the Real Property by January 1st of year of Closing, which improve-
194  ments were not in existence on January 1st of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be agreed
195  upon between the parties; failing which, request shall be made to the County Property Appraiser for an informal assessment taking into account available exemp-
196  tions. A tax proration based on an estimate shall, at request of either party, be readjusted upon receipt of current year's tax bill.
197  M. (RESERVED - purposely left blank)
198  N. INSPECTION AND REPAIR: Seller warrants that the ceiling, roof (including the fascia and soffits), and exterior and interior walls, and foundation of the Property
199  do not have any visible evidence of leaks, water damage, or structural damage and that dockage, seawalls, septic tank, pool, all appliances, mechanical items,

FAR/BAR-8   Rev. 9/07   © 2007   Florida Association of Realtors® and The Florida Bar    All Rights Reserved    Page 3 of 4

## STANDARDS FOR REAL ESTATE TRANSACTIONS (CONTINUED)

200
201 heating, cooling, electrical, plumbing systems, and machinery are in Working Condition. The foregoing warranty shall be limited to the items specified unless
202 otherwise provided in an addendum. Buyer may inspect, or at Buyer's expense, have a firm or individual specializing in home inspections and holding an
203 occupational license for such purpose (if required), or by an appropriately licensed Florida contractor, make inspections of, those items within 20 days after
204 the Effective Date. Buyer shall, prior to Buyer's occupancy but not more than 20 days after Effective Date, report in writing to Seller such items that do not
205 meet the above standards as to defects. Unless Buyer timely reports such defects, Buyer shall be deemed to have waived Seller's warranties as to defects
206 not reported. If repairs or replacements are required to comply with this Standard, Seller shall cause them to be made and shall pay up to the amount pro-
207 vided in Paragraph XII (b). Seller is not required to make repairs or replacements of a Cosmetic Condition unless caused by a defect Seller is responsible to
208 repair or replace. If the cost for such repair or replacement exceeds the amount provided in Paragraph XII (b), Buyer or Seller may elect to pay such excess,
209 failing which either party may cancel this Contract. If Seller is unable to correct the defects prior to Closing, the cost thereof shall be paid into escrow at Closing.
210 For purposes of this Contract: (1) "Working Condition" means operating in the manner in which the item was designed to operate; (2) "Cosmetic Condition"
211 means aesthetic imperfections that do not affect the Working Condition of the item, including, but not limited to, pitted marcite or other pool finishes; missing
212 or torn screens; fogged windows; tears, worn spots, or discoloration of floor coverings, wallpaper, or window treatments; nail holes, scratches, dents, scrapes,
213 chips or caulking in ceilings, walls, flooring, fixtures, or mirrors; and minor cracks in floors, tiles, windows, driveways, sidewalks, or pool decks; and (3) cracked
214 roof tiles, curling or worn shingles, or limited roof life shall not be considered defects. Seller must repair or replace, so long as there is no evidence of actual
215 leaks or leakage or structural damage, but missing tiles will be Seller's responsibility to replace or repair.
216 O. RISK OF LOSS: If, after the Effective Date, the Property is damaged by fire or other casualty ("Casualty Loss") before Closing and cost of restoration
217 (which shall include the cost of pruning or removing damaged trees) does not exceed 1.5% of the Purchase Price, cost of restoration shall be an obligation
218 of Seller and Closing shall proceed pursuant to the terms of this Contract and if restoration is not completed as of Closing, restoration costs will be escrowed
219 at Closing. If the cost of restoration exceeds 1.5% of the Purchase Price, Buyer shall either take the Property as is, together with the 1.5% or receive a
220 refund of deposit(s) thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation with respect to tree damage
221 by casualty or other natural occurrence shall be the cost of pruning or removal.
222 P. CLOSING PROCEDURE: The deed shall be recorded upon clearance of funds. If the title agent insures adverse matters pursuant to Section 627.7841, F.S.,
223 as amended, the escrow and closing procedure required by this Standard shall be waived. Unless waived as set forth above the following closing procedures
224 shall apply: (1) all closing proceeds shall be held in escrow by the Closing Agent for a period of not more than 5 days after Closing; (2) if Seller's title is rendered
225 unmarketable, through no fault of Buyer, Buyer shall, within the 5 day period, notify Seller in writing of the defect and Seller shall have 30 days from date of receipt
226 of such notification to cure the defect; (3) if Seller fails to timely cure the defect, all deposits and closing funds shall, upon written demand by Buyer and within 5
227 days after demand, be returned to Buyer and, simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and recon-
228 vey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand for refund, Buyer shall take title as is, waiving all
229 rights against Seller as to any intervening defect except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.
230 Q. ESCROW: Any Closing Agent or escrow agent (collectively "Agent") receiving funds or equivalent is authorized and agrees by acceptance of them to deposit
231 them promptly, hold same in escrow and, subject to clearance, disburse them in accordance with terms and conditions of this Contract. Failure of funds to clear
232 shall not excuse Buyer's performance. If in doubt as to Agent's duties or liabilities under the provisions of this Contract, Agent may, at Agent's option, continue to
233 hold the subject matter of the escrow until the parties hereto agree to its disbursement or until a judgment of a court of competent jurisdiction shall determine the
234 rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the dispute. An attorney who represents a party and also acts
235 as Agent may represent such party in such action. Upon notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to
236 the extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will comply with provisions of Chapter 475, F.S., as
237 amended. Any suit between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder, or in any suit wherein Agent interpleads the sub-
238 ject matter of the escrow, Agent shall recover reasonable attorney's fees and costs incurred with these amounts to be paid from and out of the escrowed funds or
239 equivalent and charged and awarded as court costs in favor of the prevailing party. The Agent shall not be liable to any party or person for misdelivery to Buyer or
240 Seller of items subject to the escrow, unless such misdelivery is due to willful breach of the provisions of this Contract or gross negligence of Agent.
241 R. ATTORNEY'S FEES; COSTS: In any litigation, including breach, enforcement or interpretation, arising out of this Contract, the prevailing party in such
242 litigation, which, for purposes of this Standard, shall include Seller, Buyer and any brokers acting in agency or nonagency relationships authorized by
243 Chapter 475, F.S., as amended, shall be entitled to recover from the non-prevailing party reasonable attorney's fees, costs and expenses.
244 S. FAILURE OF PERFORMANCE: If Buyer fails to perform this Contract within the time specified, including payment of all deposits, the deposit(s) paid
245 by Buyer and deposit(s) agreed to be paid, may be recovered and retained by and for the account of Seller as agreed upon liquidated damages, consid-
246 eration for the execution of this Contract and in full settlement of any claims; whereupon, Buyer and Seller shall be relieved of all obligations under this
247 Contract; or Seller, at Seller's option, may proceed in equity to enforce Seller's rights under this Contract. If for any reason other than failure of Seller to
248 make Seller's title marketable after diligent effort, Seller fails, neglects or refuses to perform this Contract, Buyer may seek specific performance or elect
249 to receive the return of Buyer's deposit(s) without thereby waiving any action for damages resulting from Seller's breach.
250 T. CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; COPIES: Neither this Contract nor any notice of it shall be recorded in any public
251 records. This Contract shall bind and inure to the benefit of the parties and their successors in interest. Whenever the context permits, singular shall include
252 plural and one gender shall include all. Notice and delivery given by or to the attorney or broker representing any party shall be as effective as if given by
253 or to that party. All notices must be in writing and may be made by mail, personal delivery or electronic media. A legible facsimile or electronic (including
254 "pdf") copy of this Contract and any signatures hereon shall be considered for all purposes as an original.
255 U. CONVEYANCE: Seller shall convey marketable title to the Real Property by statutory warranty, trustee's, personal representative's, or guardian's deed, as
256 appropriate to the status of Seller, subject only to matters contained in Paragraph VII and those otherwise accepted by Buyer. Personal Property shall, at the
257 request of Buyer, be transferred by an absolute bill of sale with warranty of title, subject only to such matters as may be otherwise provided for herein.
258 V. OTHER AGREEMENTS: No prior or present agreements or representations shall be binding upon Buyer or Seller unless included in this Contract. No
259 modification to or change in this Contract shall be valid or binding upon the parties unless in writing and executed by the parties intended to be bound by it.
260 W. SELLER DISCLOSURE: There are no facts known to Seller materially affecting the value of the Property which are not readily observable by Buyer or
261 which have not been disclosed to Buyer.
262 X. PROPERTY MAINTENANCE; PROPERTY ACCESS; REPAIR STANDARDS; ASSIGNMENT OF CONTRACTS AND WARRANTIES: Seller shall
263 maintain the Property, including, but not limited to, lawn, shrubbery, and pool in the condition existing as of Effective Date, ordinary wear and tear and
264 Casualty Loss excepted. Seller shall, upon reasonable notice, provide utilities service and access to the Property for appraisal and inspections, including
265 a walk-through prior to Closing, to confirm that all items of Personal Property are on the Real Property and, subject to the foregoing, that all required
266 repairs and replacements have been made, and that the Property has been maintained as required by this Standard. All repairs and improvements shall
267 be completed in a good and workmanlike manner in accordance with all requirements of law, and shall consist of materials or items of quality, value,
268 capacity and performance comparable to, or better than, that existing as of the Effective Date. Seller will assign all assignable repair and treatment con-
269 tracts and warranties to Buyer at Closing.
270 Y. 1031 EXCHANGE: If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneous with Closing or deferred) with respect to the
271 Property under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate in all reasonable respects to effectuate the
272 Exchange, including the execution of documents; provided (1) the cooperating party shall incur no liability or expense related to the Exchange and (2) the
273 Closing shall not be contingent upon, nor extended or delayed by, such Exchange.

FAR/BAR-8   Rev. 9/07   © 2007   Florida Association of Realtors® and The Florida Bar   All Rights Reserved   Page 4 of 4

Nov 19 07 06:29p      Trisha Browne            352-241-6179                 p.1

**Addendum to Contract**
FLORIDA ASSOCIATION OF REALTORS®

Addendum No. 1_____ to the Contract dated November___, 2007 _____ between

Matthew A Geiger _____ (Seller)

and Global Asset Holdings, LLC _____ (Buyer)

concerning the property described as:

3385 Old Keystone Road, Tarpon Springs, Florida

(the "Contract"). Buyer and Seller make the following terms and conditions part of the Contract:

Seller will provide a full legal description to the Buyer (in with a prior title insurance policy and copies of any surveys showing the boundary lines. Also a parcel id number to verify property taxes shall be provided by Seller.

The Buyer will conduct a 90 day due diligence/escrow period in which this property will close on or before those 90 days as a cash transaction.

Seller shall also disclose any litigation, environmental, government, water restrictions, access restrictions, existing legal arrangements and any other impact issues that may relate to this property. Also any mineral rights that exist that may be available on this property that may effect the Buyer. Seller must provide a Sellers disclosure form to this contract.

Seller to provide copies of any covenants, codes and restrictions before closing. Also any environmental tests or soil test shall be provided to Buyer.

Sellers shall be able to keep said property on the market and be able to take any back up offers on said property. All back up contracts cannot close within the 90 days due diligence of this contract.

Buyers will pay for all title insurance and costs related to title and use the title company North American Title

Avalar Real Estate Services will be responsible in paying a referral fee to the Broker for Pacific Financial Lending at 2%. The buyer hereby agrees to hold seller and The Everett Company harmless from any and all claims, demands, commissions or any other compensation claimed by or through any other party in excess of the commissions due and payable as stated on page 2 of this contract. The buyers indemnification as stated in this paragraph shall survive any early termination of this contract or the closing of this deed.

See attached furniture list In addition to all Audio and video TV's Speakers etc have been added to list.

Buyer acknowledges that the property has not yet been permitted for the use of the helicopter pad.

Date: 11-24-07    Buyer: 

Date: _____    Buyer: 

Date: 11-27-07    Seller: _____

Date: _____    Seller: _____

This form is available for use by the entire real estate industry and is not intended to identify the user as a REALTOR. REALTOR is a registered collective membership mark that may be used only by real estate licensees who are members of the National Association of Realtors and who subscribe to its Code of Ethics. The copyright laws of the United States (17 U.S. Code) forbid the unauthorized reproduction of blank forms by any means including facsimile or computerized forms.
ACSP-2s   Rev. 6/94     ©1994 Florida Association of REALTORS®    All Rights Reserved



*Item in Home*
*Home completely Furnished*

**FOYER- 2ND FLOOR**
Buffet table- Henredon
Chairs (2) - Jeffco
Occasional tables- Henredon
Foyer table- Custom

**OFFICE- 2ND FLOOR**
Desk- Custom 4X14
Desk chair- Hancock and Moore
Paisley Chairs (2) - Drexel
End Table- Burnheart
Conference table- Burnheart (4 chairs)

**MASTER BEDROOM- 2ND FLOOR**
Council table- Ralph Lauren
Sofa- E.J. Victor
Coffee table- Ralph Lauren
Chairs (2) - Drexel
Chairs (2) – E.J. Victor
End table- Sheryl
End tables (2) - Burnheart
Sofa bench- Drexel
Bed- Custom 10X8

**LIVING ROOM- 2ND FLOOR**
Sofa- E.J. Victor
Chair & Eudemon- Sheryl
Chairs (2) - Jeffco
Sofa table- Sheryl
End table- Jeffco

**DINING ROOM- 2ND FLOOR**
Table (12 chairs) – Century

**HALLWAY- 2ND FLOOR**
Buffet tables (2) - Drexel

**FAMILY ROOM-2ND FLOOR**
Lawyer case- Thomasville
Card table (6 chairs) - Thomasville
Chest (2) - Ralph Lauren
Sofa- Marge Carson
Leather chairs (2) - Burnheart
Eudemons (2) – Sheryl
Cocktail table- Marge Carson
Chairs (2) – Sheryl

*[signatures]*

KITCHEN-2ND FLOOR
Counter stools (12) – Hancock & Moore
Chairs (2) – Drexel
Eudemon- Taylor King
Dining table- Custom /Chairs 10- Sam Moore
Chairs- Hancock & Moore
End table- Sheryl
Buffet table- Giemme
Buffet table- Lane

GAME ROOM- 1st FLOOR
Pool tables (2) - Magnolia
Pub tables (3)-
Leather bar stools (30) - Sheryl

CIGAR ROOM- 1st FLOOR
Sectional- Custom
Card table- Custom
Chairs (8) - Thomasville

THEATER- 1st FLOOR
Sofa- E.J. Victor
Leather sofas- Motion Craft
Sectional- Sheryl
End table- Lane

KITCHEN- 1st FLOOR
Tables (2) - Bakers furniture ( 6 chairs)

SAUNA ROOM - 1st FLOOR
Loveseats (2) - Kingsley and Bait
Chairs (4) - Kingsley and Bait

CABANA ROOM - 1st FLOOR
Sofa- Tommy Bahama
Chairs (6) – Tommy Bahama
Eudemons (4) - Tommy Bahama
Coffee table-

SUNKIN LIVING ROOM - 1st FLOOR
Sofas (3) - Henredon
End tables (3) - Custom
Coffee table- Custom 54X54
End table- Stanley

GUEST SUITE ONE - 3rd FLOOR
Council table- American Drew
Bed- American Drew
Night chest- American Drew
End tables (2) - American Drew
Coffee table- American Drew
Armoire- Hekmen
Desk- Hooker
Chair (2) - Taylor King
Sofa- Taylor King

GUEST SUITE TWO- 3RD FLOOR
Bed- Schnadig
Night chest- Schnadig
Armoire- Schnadig
Desk- Schnadig
Chair- Schnadig
Chest – Lane
Coffee table- Schnadig
End Table – Schnadig

BABIES ROOM- 3RD FLOOR
Beds (2) - Lane
Armoire- Lane
Dressers (2) - Lane
Crib-
Changing Table/Dresser-
Bookcase- Lane

HALLWAY- 3RD FLOOR
Curios (5) - Pulaski

GUEST ROOM THREE- 3RD FLOOR
Bed- Lane
Dresser- Lane
Armoire- Custom
Chest- Hooker
End tables (2) - Lane
Chair- Fairfield

GUEST ROOM FOUR- 3RD FLOOR
Bed- Taylor King
Armoire- Stanley
Chair- Fairfield

DEN – 3RD FLOOR
Leather chairs (2) - Henredon
Sofa- Sheryl
Coffee table- Century
End table- Sam Moore
Desk Chair- Hooker
Chair- Sam Moore

LIBRARY- 3RD FLOOR
Chair and Eudemon- Henredon
Desk-

PATIO FURNITURE- 2ND FLOOR
(Pavilion)
3 tables with 14 chairs
1 sofa
4 chairs w/ eudemons
Fire pit

POOL AREA FURNITURE-
(Kingsley and Bait)
31 pool side chairs
2 pub tables w/ 8 chairs
2 sofa benches w/ 6 chairs
10 bar stools
2 card tables w/ 8 chairs
Table w/ 8 chairs
Table w/ 10 chairs

*[signatures]*